UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
United States of America

               - against -

Richard Palase, Ralph Matroantonio, *et al.*,

                                Defendants.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**

11-CR-413 (SLT)

**TOWNES, United States District Judge,**

      Defendants Richard Palase and Ralph Mastroantonio are charged in Counts Three and Four of a multi-defendant indictment with conspiracy to operate an illegal gambling business at 2298 Arthur Kill Road, Staten Island, NY (the "Gambling Location"). Trial in this case is scheduled to commence on April 6, 2015. Currently before the Court are two motions.

      First, the Court considers motions by defendants Palase and Mastroantonio, made pursuant to Federal Rule of Criminal Procedure 12(b)(3), to suppress statements that they made to Federal Bureau of Investigation ("FBI") agents during the execution of a search warrant at the Gambling Location on the late evening of May 5, 2011 and early morning of May 6, 2011. This Court held an evidentiary hearing on August 20, 2014 and heard the testimony of FBI Special Agents Samantha Bell and Patrick Hanna. The testimony of Agents Bell and Hanna establishes that defendants, along with all other persons found at the Gambling Location, were temporarily detained incident to the execution of the search warrant while officers from the New York City Police Department ("NYPD") confirmed that none of the people present at the scene had outstanding arrest warrants. Every person found at the Gambling Location was initially restrained, for the safety of law enforcement agents, with flexible handcuffs and no *Miranda* warnings were issued. Agent Bell announced that no one was under arrest. Shortly after the Gambling Location was secure, Palase initiated contact with Agent Hanna and made some of the

1

statements that he now seeks to suppress. Thereafter, Palase and Mastroantonio, no longer wearing flexible handcuffs, made additional statements that they seek to suppress during non-compulsory interviews led by Agent Bell. The Court finds that Palase and Matroantonio were not in custody at the time that they made any of the statements at issue in this motion. Accordingly, the Court denies the Defendants' motions to suppress in their entirety.

The second motion before the Court is Mastroantonio's motion for severance from Palase, on the grounds that certain medical problems suffered by Palase may delay a joint trial. That motion is denied with leave to renew, as Mastroantonio has failed to establish that Palase's health problems – which have not yet delayed the joint trial in this case – will prejudice Matroantonio.

## Findings of Fact

The evidence received at the evidentiary hearing on defendants' suppression motions consisted of the testimony of FBI Special Agents Bell and Hanna. The Court finds that the testimony of Agents Bell and Hanna was credible, convincing, consistent, and uncontroverted. The testimony withstood the thorough cross examination of both defense counsel – no germane inconsistencies or flaws were revealed. Furthermore, no competing narrative contradicted the FBI agents' testimony. For these reasons, the following facts are adopted as the findings of this Court. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").

On May 5, 2011, between approximately 11:30 p.m. and 4:00 a.m., a team of FBI agents and NYPD officers executed a search warrant on the Gambling Location. (Tr. 9:21-14:14.) An FBI SWAT team, consisting of approximately 10 FBI agents wearing uniforms, tactical gear, and body armor displaying the FBI logo first entered and secured the location because the FBI

2

suspected that there could be an armed off-duty police officer inside the location. (Tr. 14:17-16:9; 41:23-25; 73:1-4.) During this initial SWAT operation, SWAT team members called Agent Bell to the scene because there were females in the Gambling Location, who needed to be patted down for weapons. (Tr. 17:19-25.) When Agent Bell entered, she found approximately 20 people (not including law enforcement) present at the location, all of whom – gamblers and hosts alike – were handcuffed with flexible handcuffs behind their backs and were facing the walls, for the safety of law enforcement agents. (Tr. 21:1-22:20; 24:7-11; 77:6-19.)

Once the Gambling Location was secure, Agent Bell addressed the room and announced that law enforcement was there to execute a search warrant, that "no one was under arrest," and that everyone would be "free to go" after the NYPD checked each person for open arrest warrants – or "processed" them. (Tr. 24:15-25:4; 42:24-43:20; 65:18-25.) No *Miranda* warnings were administered. (Tr. 44:5-8; 47:10-12.) After the location was secure, the SWAT team left and the search team, consisting of approximately 5 FBI agents and 5 NYPD officers, entered to execute the search warrant. (Tr. 16:16-17:9; 73:8-22.) At some point, after "the scene was relatively safe and secure," but before individuals were "processed" by the NYPD for outstanding warrants, possibly "within the first hour," the flexible handcuffs were removed. (Tr. 115:18-121:9.)

After making the aforementioned announcement, Agent Bell left the location for ten to fifteen minutes. (Tr. 25:4-6.) During her absence, as described below, Agent Hanna spoke with Palase. When Agent Bell returned, FBI agents and NYPD officers were searching people who were no longer in flexible handcuffs and processing them for outstanding warrants. (Tr. 25:24-26:12.) Agent Bell began conducting interviews of anyone who was willing to speak with her; she interviewed five to ten individuals that evening, including Palase and Mastroantonio. (Tr.

3

34:6-14; 49:9-12.) Once the NYPD confirmed that a person had no outstanding warrants, that person was free to leave and left through the front door. (Tr. 35:4-13.) Until a person was processed for outstanding warrants, however, he or she was not free to leave. (Tr. 43:5-17; 48:21-25.) Neither Palase nor Mastroantonio was arrested that day. (Tr. 33:22-24; 91:8-13; 40:18-19.)

First Palase Interview

Shortly after the location was secured by SWAT agents, Agent Hanna entered the location and stood near NYPD Internal Affairs Bureau Sergeant Art Staudinger. (Tr. 81:6-13.) Palase, who was standing along the wall, initiated contact with Agent Hanna by "lean[ing] back, stepp[ing] back a little bit and ask[ing] to speak to someone." (Tr. 81:18-22). Palase said either: "Can I speak to you" or "Can I tell you something." (Tr. 81:21-22.) At the time, Palase was wearing flexible handcuffs. (Tr. 82:18-19.) Agent Hanna asked Palase what he wanted to talk about. (82:1-7.) Palase volunteered that he was an NYPD officer and that he was not at the Gambling Location in his official capacity, and "then he walked away from the crowd of people towards the small vestibule area...." (Tr: 82:4-10; 94:12-14.) Agent Hanna and Sergeant Staudinger followed Palase, who proceeded to volunteer information to the officers. (Tr. 82:20-23; 83:2-4.) The officers asked him follow-up questions, based on the information he had volunteered. (Tr. 81:24-82:1.)

At no point did Agent Hanna or Sergeant Staudinger tell Palase that he was under arrest, or indicate that he had to speak with law enforcement, or had to tell the truth. (Tr. 83:14-84:3.) The three men stood arms-length apart, and were "[r]elatively quiet." (Tr. 84:6-15; 85:8-19.) Palase was "calm" throughout the three to four minute conversation, and at no point did he indicate that he wanted to stop speaking with Agent Hanna or Sergeant Staudinger. (Tr. 84:4-

4

25.) After they finished speaking, Agent Hanna and Sergeant Staudinger walked Palase back to the main room. (Tr. 85:22-25.)

At the evidentiary hearing, Palase's counsel sought to inquire into the substance of the conversation between Palase and the law enforcement officers in order to establish that, at some point, the conversation, which was initially voluntary, turned into an interrogation for the purposes of *Miranda*. The Government objected on relevance grounds and the following exchange took place:

> THE COURT: [*Speaking to the AUSA*] Well if you're not conceding that he was interrogated, I'm going to allow [Palase's attorney] to go through what he was asked and what he said.
>
> AUSA NGUYEN: The government doesn't – concedes the facts that the defendant was interviewed, yes. The government concedes and the agent has testified that the defendant was interviewed, yes.
>
> THE COURT: And that's interrogated for the purposes of *Miranda*?
>
> AUSA NGUYEN: That's correct, your Honor.

(Tr. 105:7-17.) Accordingly, the Court sustained the Government's objection and did not permit Palase's counsel to inquire into the substance of the conversation.

Second Palase Interview

Agents Bell and Hanna conducted an interview of Palase later that night. (Tr. 86:8-10.) Agent Bell initiated the conversation; she approached Palase and asked him if he was willing to speak with her and Agent Hanna. (Tr. 27:16-28:21.) Palase agreed, and the three moved, while remaining visible to the others, to a location on the other side of the room, between three poker tables, and they sat at one of the tables. (Tr. 28:24-30:4; 31:17-21; 87:6-18.) Agent Bell testified that Palase was "polite, professional, and forthcoming" during the interview. (Tr. 31:8-10.) Agent Hanna testified that it appeared to him that Palase understood that he was not under

5

arrest. (Tr. 88:24-89:2.) The interview lasted approximately fifteen minutes. (Tr. 32:3-5; 89:10-12.)

When Agent Bell approached Palase, he was not wearing flexible handcuffs and during the interview, he was not physically restrained in any way. (Tr. 28:22-23; 86:10-13.) Agent Bell specifically told Palase at the beginning of the interview that he was not under arrest. (Tr. 30:5-8; 47:17-19; 88:19-23.) Agent Bell, who led the interview, began by introducing herself and Agent Hanna as FBI agents. (Tr. 87:3-5, 19-24.) Neither agent told Palase that he was under arrest or that he was required to speak with law enforcement, although Agent Bell did tell Palase that he had to be honest because lying to an officer is a "1001 violation." (Tr. 30:9-31:7; 88:1-18.) At no point during the interview did Palase indicate that he did not want to speak with law enforcement or that he wanted to leave the Gambling Location, and the conversation remained "relatively calm" throughout. (Tr. 32:10-33:9; 89:22-90:23.) After the interview, the agents "thanked him and he got back in line ... to be processed by NYPD." (Tr. 33:15-21.)

Mastroantonio Interview

Agent Bell also spoke with Mastroantonio. (Tr. 35:14-16.) She could not recall whether this interview occurred before or after her interview with Palase. (Tr. 36:4-6.) She approached Mastroantonio as he stood on line and asked him if he would be willing to speak with her. (Tr. 36:7-14.) Mastroantonio agreed. (Tr. 36:15-16.) Mastroantonio was not handcuffed or restrained in any way. (Tr. 36:17-21.) Agent Bell interviewed Mastroantonio alone. (Tr. 36:22-25.) They sat at a table in the main room, facing each other, away from but visible to the others in the room. (Tr. 37:10-18.) Agent Bell introduced herself to Mastroantonio and told him that he should be truthful because lying to an officer is a "1001 violation." (Tr. 37:18-23.) She testified she could not remember whether she specifically told Mastroantonio at the beginning of

the interview that he was not under arrest, although it is undisputed that the interview took place after Agent Bell announced to the crowd that no one was under arrest. (Tr. 50:22-51.) They spoke briefly, for approximately 5 minutes, at which point Agent Bell ended the interview because she believed Mastroantonio was being "slightly rude," in that he was not being forthcoming, provided brisk answers, and declined to elaborate on his answers. (Tr. 39:2-7; 63:6-21; 64:20-65:1.) At no point during the interview did Mastroantonio indicate to Agent Bell that he did not want to speak with her or that he wanted to leave the Gambling Location. (Tr. 39:22-40:15; 63:22-24.) After the interview, Mastroantonio returned to the line. (Tr. 40:16-17.)

**Conclusions of Law**

**I.      Motions to Suppress Statements Made by Palase and Mastroantonio**

On a motion to suppress statements made under the Fifth Amendment, the burden initially falls on the defendant to demonstrate that he was subject to custodial interrogation, and then shifts, once the defendant establishes a basis for his motion, to the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers. *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005); *United States v. Burger*, 739 F.2d 805, 809 (2d Cir. 1984). In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that the Government may not use, in its case in chief, a defendant's statements that are the product of a custodial interrogation unless the defendant was warned of his Fifth Amendment privilege against self-incrimination and voluntarily waived that privilege. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). "*Miranda*'s warning requirements apply only to 'custodial interrogation.'" *Id.* at 673. Here, the government concedes that defendants were not given *Miranda* warnings prior to interrogative questioning by Agents Bell and Hanna, but

7

contends that *Miranda* warnings were unnecessary because defendants were not "in custody" for the purposes of *Miranda* at the time they made the statements.[1]

In determining whether a defendant was "in custody" for the purposes of *Miranda*, a court must consider "the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned." *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)). Thus, the test for whether an individual is in custody is an objective one, based on "whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." *Newton*, 369 F.3d at 672. "[I]f a reasonable person would not have thought himself free to leave, additional analysis is required because ... not every seizure constitutes custody for purposes of *Miranda*." *Id.* (citation omitted); *see also Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (finding that motorists subjected to routine traffic stops generally did not "feel free ... to leave the scene," but were nevertheless not "in custody" for the purposes of *Miranda*). "In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672. "Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Id.* (quoting *Berkemer*, 468 U.S. at 440).

---

[1] With respect to the first of Palase's statements at issue in this motion, it was Palase who initiated contact with the agents. "[C]ustodial interrogation [ ] mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by" *Miranda's* holding. *Id.* at 478. The Court assumes, as the Government conceded at the evidentiary hearing, that this voluntary conversation at some point turned into an interrogation for the purposes of *Miranda*. This Court's analysis only applies to the answers Palase provided to follow-up questions posed by Agent Hanna and Sergeant Staudinger.

The United States Supreme Court has identified two factors as "particularly relevant to determining whether a lawful investigatory stop involves restraints generally associated with a formal arrest," (1) whether "a reasonable person in the suspect's shoes would have understood that his detention was not likely to be 'temporary and brief,'" and (2) "whether a person stopped under the circumstances at issue would feel that he was 'completely at the mercy of the police.'" *Newton*, 369 F.3d at 675 (quoting *Berkemer*, 468 U.S. at 437-38). In determining whether restraints generally associated with a formal arrest are present, courts consider "the circumstances surrounding the [interrogation,]" such as "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011).

Here, defendants seek to suppress three statements: (1) statements made by Palase to Agent Hanna and Sergeant Staudinger during a three to four minute interview, which was conducted after Palase, still in flexible handcuffs, initiated a conversation with the agents and led them away from a crowd; (2) statements made by Palase to Agents Bell and Hanna during a fifteen minute interview, conducted when Palase was no longer in flexible handcuffs but was not yet free to leave the Gambling Location because the NYPD had not "processed" him for outstanding warrants; and (3) statements made by Mastroantonio during a five minute interview with Agent Bell, when Mastroantonio was also no longer in flexible handcuffs but was not yet free to leave. The Court must examine the surrounding circumstances to determine whether Palase and Mastroantonio felt their freedom of action had been curtailed to a degree associated with formal arrest. Most of the relevant facts suggest that the defendants were not in custody.

First, Palase and Mastroantonio were expressly advised that they were not under arrest and would be free to go as soon as the NYPD confirmed that no one found in the Gambling Location had any outstanding arrest warrants. *See Newton*, 369 F.3d at 676 (informing subject that he is not under arrest and is free to leave "is a fact that may be considered in assessing the extent to which a reasonable person would understand any restraints on his freedom to be comparable to those associated with a formal arrest"); *United States v. Groezinger*, 625 F. Supp. 2d 145, 158 (S.D.N.Y. 2009) (finding interview non-custodial where agents "stated that they were there to execute a search warrant, and, ... explicitly told [the defendant] that he was *not* under arrest. After [the defendant] informed the agents that he was an attorney and that he had a morning court appearance in Manhattan, the agents told him that he was going to [be] *late,* thus indicating that he would be free to leave once the search was completed.") (emphasis in original). Here, Agent Bell announced to the crowd that "no one was under arrest" and everyone would be "free to go" after NYPD's open warrants processing was complete. (Tr. 24:15-25:4.) Moreover, prior to commencing the second interview, Agent Bell advised Palase, a second time, that he was not under arrest and would be free to leave as soon as the NYPD completed its open warrants processing.

Second, all of the interviews at issue were conducted in a familiar setting – at the defendants' place of business. *See United States v. Schaffer*, No. 12-CR-430 ARR, 2014 WL 1515799, at *8 (E.D.N.Y. Apr. 18, 2014) (finding defendant not "in custody" for the purposes of *Miranda* because, *inter alia*, "he interview took place in the familiar setting of his own office premises" while police executed a search warrant of the location); *cf Newton*, 369 F.3d at 675 ("[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); *United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (holding that

defendant was not in custody where, among other things, the entire interview occurred in the "familiar surroundings of [the defendant's] home").

Third, the tone and duration of the interviews militates against finding them custodial. Agents Bell and Hanna testified that the interviews were calm, polite, and non-confrontational. *See Mitchell*, 966 F.2d at 99 (finding defendant was not in custody where, *inter alia*, he "freely answered the questions put to him" and "remained calm throughout the interview," and where agents did not "suggest[] that [the defendant] could not have terminated the interview" and made "no verbal threats or intimidating physical gestures" toward defendant); *United States v. Lifshitz*, No. 03 CR. 572 (LAP), 2004 WL 2072468, at *1, *7 (S.D.N.Y. Sept. 15, 2004) (finding interview non-custodial where, *inter alia*, "[t]he agents' demeanor was calm, and they immediately explained to the defendant that he was not under arrest," the defendant "readily agreed" when "asked ... if he would answer some questions" and was "very talkative," and the conversation "was relaxed and conversational in nature and at no time was the defendant threatened, yelled at, or physically restrained in any way."); *United States v. Cunningham*, No. 5:11-CR-65, 2012 WL 369923, at *5 (D. Vt. Feb. 3, 2012) (finding interview non-custodial where, *inter alia*, "agents questioned the Defendant in a normal, conversational manner and did not employ force, trickery, or deceit."); *United States v. Simard*, No. 2:10-CR-47-1, 2011 WL 1045766, at *4 (D. Vt. Mar. 17, 2011) (finding interview non-custodial where, *inter alia*, "[t]he conversation remained ... calm and polite"). Palase initiated the first interview in order to volunteer that he was an off-duty police officer, and spoke with officers for 3 or 4 minutes. Agent Hanna described that conversation as "relatively quiet." (Tr. 84:6-15.) Agent Bell later approached Palase and Mastroantonio to ask them whether they would be willing to speak with her; they both agreed. The second conversation with Palase was conversational; Agent Bell

11

described Palase as "polite, professional and forthcoming." (Tr. 31:8-10.) Likewise, she described her conversation with Mastroantonio as "calm," although she believed he was "slightly rude." (Tr. 39:2-7; 40:9-11.) There is no indication that defendants felt any coercive pressure to agree to speak with agents; other people at the Gambling Location left through the front door without speaking to agents as soon as NYPD processing was complete. Palase spoke with Agents Bell and Hanna for approximately 15 minutes, while Mastroantonio's interview lasted 5 minutes. These are not the type of "marathon interrogation sessions" generally indicative of custodial interrogation. *See Lifshitz*, 2004 WL 2072468, at *8 (finding interview non-custodial because, *inter alia*, it "was not overly long – lasting approximately 45 minutes to one hour."); *Cunningham*, 2012 WL 369923, at *5 (finding interview noncustodial where it "lasted only forty-five minutes and was not a 'marathon session designed to force a confession.'") (internal citation omitted).

Finally, the fact that the defendants were not arrested until one month later weighs heavily in favor of finding the interviews non-custodial. *See United States v. Bershchansky*, 958 F. Supp. 2d 354, 382 (E.D.N.Y. 2013) (finding relevant that "defendant was not arrested at the conclusion of the interview."); *Cunningham*, 2012 WL 369923, at *5 (observing that "[d]efendant was not arrested at the conclusion of the interview" and noting that "this factor weighs heavily in favor of finding interrogation noncustodial.").

Defendants argue that two facts militate in favor of finding that they were in custody. First, although defendants were expressly told that they were not under arrest and would be free to leave the Gambling Location, they were also told that they were not free to leave until the NYPD confirmed that they did not have any outstanding arrest warrants. Second, all of the approximately 20 people who were at the Gambling Location when the SWAT agents entered,

12

including defendants, were initially placed in flexible handcuffs. Indeed, Palase made the first statement that he now seeks to suppress while he was still in flexible handcuffs. However, these facts do not establish that defendants were in custody.

With respect to the fact that defendants were told that they were not free to leave until the NYPD completed its open warrants processing, it is clear and not disputed by the parties that reasonable people in the defendants' shoes would not have thought they were "free to leave the police encounter at issue." *Newton*, 369 F.3d at 672; *see also Groezinger*, 625 F. Supp. 2d at 158. As in *Groezinger*, "[l]aw enforcement officials were searching [the Gambling Location], agents remained with [the defendants], and they limited [their] freedom to move about [the location]." *Groezinger*, 625 F. Supp. 2d at 158. However, this is not dispositive because the relevant question is whether "'a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest.*'" *Id.* (quoting *Newton*, 369 F.3d at 672.) (emphasis added).

The mere fact that defendants, along with the approximately 18 other people found at the Gambling Location, were restricted in their freedom to move about or leave the Gambling Location does not compel a finding of custody. This is because restraints on liberty for the safety of officers during execution of a valid search warrant do not constitute "custody" for the purposes of *Miranda*, where a defendant is aware that such restraints are a temporary precautionary measure. *See United States v. Badmus*, 325 F.3d 133, 138-139 (2d Cir. 2003) (finding suspects not in custody even though they were asked to stay seated in the living room and were not allowed to move freely about their home as six officers searched their apartment for nearly three hours); *Groezinger*, 625 F. Supp. 2d 145, 151 (S.D.N.Y. 2009) (finding defendant not in custody, although he was told that he was not free to leave and

was forced to sit in his kitchen for an hour and a half while officers executed a search warrant of his home); *Bershchansky*, 958 F. Supp. 2d at 382-83 (finding defendant not in custody although his hands were held behind his back, and he was escorted from his bedroom to his kitchen "in order to protect the agents executing the search [warrant] and conducting the interview"). Here, defendants were aware that their detention would be a temporary measure, and that each would be free to leave once the NYPD completed processing him for open warrants. Agent Bell announced shortly after SWAT had secured the location that "no one was under arrest" and everyone would be "free to go." (Tr. 24:15-25:4.) Although the NYPD's database search for open warrants was a slow process, this was only because there were approximately 20 people at the location. Once individuals had been searched for weapons and the area secured, their flexible handcuffs were taken off and those 20 people were generally free to move about the location, unrestrained. Each was free to leave immediately after the NYPD confirmed he or she had no open warrants. Thus, the mere fact that no one found at the Gabling Location was free to leave until after the NYPD completed its open warrants processing does not render the statements at issue custodial.

Likewise, although "[h]andcuffs are generally recognized as a hallmark of a formal arrest," *Newton*, 369 F.3d at 675-77, the temporary use of flexible handcuffs does not automatically transform the brief detention into "custody" for purposes of *Miranda*. *See United States v. Cota*, 953 F.2d 753, 758-59 (2d Cir. 1992) (finding defendant was not in custody, where "the initial use of guns and handcuffs [was] necessitated by the officers' safety concerns, [and] the handcuffs were removed as soon as the car was examined and the perceived security threat abated."); *United States v. Nguyen*, No. 2:05CR130-3, 2006 WL 2260104, at *9 (D. Vt. Aug. 7, 2006) (finding defendant was not in custody although an agent handcuffed him prior to searching

his car, where defendant was informed that he was not under arrest and was being handcuffed "merely in order to prevent flight and obstruction of justice and to ensure the agents' and [defendant's] own safety."); *United States v. Touzel*, 409 F. Supp. 2d 511, 522-23 (D. Vt. 2006) *aff'd*, 281 F. App'x 37 (2d Cir. 2008) (finding defendant was not in custody although he was handcuffed while an officer searched his car, where defendant was told that he was not under arrest and handcuffs would be a temporary measure.); *United States v. Montalvo*, No. 11-CR-00366-RJA-JJM, 2014 WL 3894374, at *6 (W.D.N.Y. Apr. 16, 2014), *R&R adopted*, 2014 WL 3894383 (W.D.N.Y. Aug. 8, 2014) (finding defendant was not "in custody" for purposes of *Miranda*, although he was handcuffed, separated from his family, and transported to an interview room in the state police barracks, because he was repeatedly told that he was not under arrest and was only being detained while police executed a search warrant of his vehicle); *United States v. Toumasian*, No. 1:10-CR-0291-TCB-JFK, 2011 WL 3798223, at *11 (N.D. Ga. July 19, 2011), *R&R adopted*, 2011 WL 3738980 (N.D. Ga. Aug. 22, 2011) (finding defendant was not "in custody" for purposes of *Miranda*, where officers used force to breach both the front door of the residence and the door to the defendant's bedroom, with weapons drawn when entering and securing the residence, and placed defendant in handcuffs while executing a search warrant, because his detention was temporary and "defendant had not been treated any differently than any other person who is secured ... during the execution of a search warrant."). Rather, to determine whether the defendants were "in custody" for the purposes of *Miranda*, courts consider "all the circumstances presented." *Newton*, 369 F.3d at 677.

In *Newton*, the defendant, wearing only underwear, was handcuffed immediately upon opening his front door for officers. In finding that Newton was "in custody" for purposes of *Miranda*, the Second Circuit emphasize that although Newton was told that he was not under

arrest, "Newton was [not] told that the specific reason for a safety concern [necessitating handcuffs] in his case was that the officers were searching for a gun[, and thus,] ... a reasonable person in his situation would [not] have understood that the handcuffing would likely last only until the officers had completed their search ... [nor would such a reasonable person] understand[] that removal or maintenance of the handcuffs depended on the outcome of the search rather than on the suspect's responding to questions posed." *Id.* The Court found that "handcuffing Newton, though reasonable to the officers' investigatory purpose," nevertheless constituted "custody" because "a reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police-in other words, that he was restrained to a degree normally associated with formal arrest and, therefore, in custody." *Id.*

Here, by contrast, a reasonable person in either of defendant's shoes would have understood that his detention was likely to be temporary and brief and would not have felt that his or her movements were under the total control of the police. Although defendants were not free to leave until open warrant processing was complete and were initially, temporarily handcuffed, they were expressly told that they were not under arrest, agreed to speak with officers, were interviewed briefly (for at most 20 minutes total), in calm and polite interviews, which took place in the familiar setting of their place of business. Unlike in *Newton*, in which the sole defendant was handcuffed in his underwear and may not have understood the reason he was being handcuffed, a reasonable person in either of the defendants' shoes would have understood that the use of flexible handcuffs was necessitated by safety concerns, in light of the large number of (fully-dressed) people found at the location. Once the area was secure and each of the people at the Gambling Location had been searched for weapons, they were uncuffed.

Moreover, a reasonable person standing in either of defendant's shoes would have understood that the removal or maintenance of handcuffs did not depend on answering questions – indeed, FBI agents did not initiate contact with the defendants until after their flexible handcuffs were removed. This Court finds the statements made by defendants after they were no longer in handcuffs were non-custodial because "reasonable pe[ople] in the [defendants'] shoes would have understood that [their] detention was ... likely to be 'temporary and brief,'" and would not have felt "'completely at the mercy of the police.'" *Newton*, 369 F.3d at 675.

Palase's first interview presents a harder question than the other interviews at issue in this motion because Palase was still wearing flexible handcuffs during the 3 to 4 minute conversation he had with Agent Hanna and Sergeant Staudinger. However, unlike in *Newton*, a reasonable person in Palase's shoes would not have believed that removal of the handcuffs depended on answering the follow-up questions posed by the law enforcement agents. This is because Palase, and not the agents, initiated the conversation and he chose to do so before his flexible handcuffs were removed. According to the timeline testified to by Agents Bell and Hanna, Palase initiated contact with officers very shortly after the FBI entered the location. Agent Bell was the first non-SWAT FBI agent to enter the scene – she was called in to pat down females found at the location – and, after completing this task and announcing that none of the people detained was under arrest, she left for approximately 10 to 15 minutes. It was during this absence that Palase stepped away from the crowd, while in flexible handcuffs, and volunteered that he was an off-duty police officer. From his conduct, it is clear that he did not feel that he was "at the mercy" of the police. Despite the flexible handcuffs, Palase felt his freedom of movement was relatively unrestrained, as evinced by the fact that once he had their attention, he led Agent Hanna and Sergeant Staudinger away from the crowd into a vestibule before continuing to speak. A

reasonable person who believes he is under arrest does not lead officers to a different area in order to speak with them. Rather, this conduct, taken together with the surrounding circumstances, suggests that Palase knew his detention, including the handcuffing, was a temporary safety measure and would likely be brief. Thus, the Court concludes that, although Palase was still wearing flexible handcuffs during the interview, he was not in custody for purposes of *Miranda*.

For the forgoing reasons, defendants' motions to suppress are denied in their entirety because the defendants were not in custody at the time they made the statements at issue.

## II. Mastroantonio's Motion to Sever

Mastroantonio moves to sever his trial from Palase's because he speculates that Palase might not be ready for trial in April for medical reasons, and asserts that "[w]aiting for a joint trial with Palase would fatally prejudice [] Mastroantonio's right to a speedy trial[.]" (Mastroantonio's Post-Hearing Letter Br. at 2.)

> Rule 14 of the Federal Rules of Criminal Procedure provides that:
>
> If the joinder of ... defendants in an indictment ... for trial appears to prejudice a defendant ..., the court may ... sever the defendants' trials[] or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Such motions are committed to the "sound discretion of the trial judge." *United States v. Ferguson*, 676 F.3d 260, 286-87 (2d Cir. 2011) (quoting *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008)).

The United States Supreme Court has explained that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together," because joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537-38 (1993) (internal citations and quotation

marks omitted). Accordingly, the Court has instructed that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 *only* if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539 (emphasis added).

In *United States v. Minaya*, non-death-eligible defendants sought severance under Rule 14 on the grounds that the death-eligibility of some of their co-defendants could "unduly delay trial for non-death-eligible defendants." 395 F. Supp. 2d 28, 40-41 (S.D.N.Y. 2005). The court observed that "[i]n any multi-defendant case," the pre-trial period "will be longer than in an action involving only one defendant," but found this delay – even where a defendant was incarcerated – did not justify severance. *Id.* at *41. However, the court recognized that, should the Government decide to seek the death penalty, jury selection and trial could take significantly longer due to the additional evidence required in death-penalty-eligible cases. Given that the Government had not yet decided to seek the death penalty for any of the defendants in the case, the court denied the motions for severance with leave to renew. Here, too, it is not yet clear whether Palase's medical condition will delay a joint trial in this case. Some reasonable delays, whether due to scheduling conflicts of attorneys or availability of defendants, are expected and acceptable in multi-defendant cases. Trial in this case is currently scheduled for April 6, 2015 and, at this moment, nothing in the record suggests that Palase will be medically unable to be tried at that point or at a reasonable time thereafter. Accordingly, the motion for severance is denied. If Mastroantonio's fears of significant health-related delays materialize, he may renew his motion at that time. The Court notes that the trial date that was set "in this case is to some extent the result of the Court's own trial calendar, such that severance would not necessarily

result in the possibility of a significantly earlier trial date." *Id.* Accordingly, Mastroantonio's motion for severance is denied at this time.

## Conclusion

Motions to supress pre-arrest statements by Palase and Mastroantonio are denied. Mastroantonio's motion for severance is denied with leave to renew.

**SO ORDERED**

                                                S/
                                    SANDRA L. TOWNES
                                    United States District Judge

Dated: Brooklyn, New York
       December 1, 2014